323 F.2d 959
 G. C. SIMKINS, Jr., A. W. Blount, Jr., et al., Plaintiffs, and United States of America, Intervenor, Appellants,
v.
The MOSES H. CONE MEMORIAL HOSPITAL, a Corporation, Harold Bettis, Director of The Moses H. Cone Memorial Hospital, and Wesley Long Community Hospital, a Corporation, and A. O. Smith, Administrator of the Wesley Long Community Hospital, Appellees.
 No. 8908.
 United States Court of Appeals Fourth Circuit.
 Argued April 1, 1963.
 Decided November 1, 1963.
 
 Jack Greenberg, New York City (James M. Nabrit, III, New York City, Michael Meltsner, New York City, and Conrad O. Pearson, Durham, N. C., on brief), for appellants other than the United States.
 Harold H. Greene, Dept. of Justice, (Burke Marshall, Asst. Atty. Gen., William H. Murdock, U. S. Atty., St. John Barrett and Howard A. Glickstein, Attys., Dept. of Justice, on brief), for the United States, intervenor, appellant.
 Charles E. Roth, Greensboro, N. C. (Herbert S. Falk, Greensboro, N. C., on brief), for The Moses H. Cone Memorial Hospital and Harold Bettis, its Director, appellees.
 Thornton H. Brooks, Greensboro, N. C. (Thomas O. Moore, Jr., and McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on brief), for Wesley Long Community Hospital, Inc., and A. O. Smith, appellees.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.
 SOBELOFF, Chief Judge.
 
 
 1
 The threshold question in this appeal is whether the activities of the two defendants, Moses H. Cone Memorial Hospital and Wesley Long Community Hospital, of Greensboro, North Carolina, which participated in the Hill-Burton program, are sufficiently imbued with "state action" to bring them within the Fifth and Fourteenth Amendment prohibitions against racial discrimination. Beyond this initial inquiry lies the question of the constitutionality of a portion of the Hill-Burton Act (Hospital Survey and Construction Act), 60 Stat. 1041 (1946), as amended, 42 U.S.C.A. § 291e(f),[1] and a regulation pursuant thereto, 42 C.F.R. § 53.112,[2] 21 Fed.Reg. 9841 (December 12, 1956). Because of the importance of these questions the court, on its own motion, has heard the appeal en banc.
 
 
 2
 The plaintiffs are Negro physicians, dentists and patients suing on behalf of themselves and other Negro citizens similarly situated. Their complaint seeks declaratory and injunctive relief against the defendant hospitals and their respective administrators and directors. The basis of their complaint is that the defendants have discriminated, and continue to discriminate, against them because of their race in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The plaintiffs seek an injunction restraining the defendants from continuing to deny Negro physicians and dentists the use of staff facilities on the ground of race; an injunction restraining the defendants from continuing to deny and abridge admission of patients on the basis of race, and refusing on that basis to permit patients to be treated by their own physicians and dentists at the defendant hospitals; and a judgment declaring unconstitutional 42 U.S.C.A. § 291e(f) and 42 C.F.R. § 53.112, which authorize the construction of hospital facilities and the promotion of hospital services with funds of the United States on a "separate-but-equal" basis.
 
 
 3
 Since this proceeding is one in which "the constitutionality of * * * [an] Act of Congress affecting the public interest * * * [has been] drawn in question, "the United States, pursuant to 28 U.S.C.A. § 2403 and Rule 24(a), Fed. R.Civ.P., moved to intervene. Its motion for intervention was granted and throughout the proceedings the Government, unusually enough, has joined the plaintiffs in this attack on the congressional Act and the regulation made pursuant thereto.
 
 
 4
 The present appeal is from a final order of the District Court, entered December 17, 1962, granting the defendants' Motion to Dismiss for lack of jurisdiction on the ground that no "state action" was proved and denying the motions by the plaintiffs and the United States for summary judgment.[3] The plaintiffs and the United States appealed.
 
 
 5
 As the District Court concluded, there is no material issue of fact. Moreover, extensive and well-supported findings of fact were made by that court.[4] We will not undertake to repeat these findings which are to be deemed incorporated in our opinion by reference. We set forth only such facts as are necessary for the development of the discussion.
 
 FACTUAL BACKGROUND
 
 6
 Six of the plaintiffs are physicians and three are dentists, and all of them are duly licensed and practice their professions in Greensboro. Before filing the complaint they sought staff privileges at the defendant hospitals, which were denied them because of racial exclusionary policies. Two of the plaintiffs are persons in need of medical treatment who desire to enter either of the defendant hospitals which, they contend, possess the most complete medical equipment and the best facilities available in the Greensboro area. They also desire to be treated by their personal physicians who are Negroes. The Long Hospital, however, completely excludes Negro patients and professionals. The Cone Hospital, on the other hand, excludes all but a select few Negro patients, who are admitted on special conditions not applied to whites; and, when the complaint was filed, this hospital did not admit Negro doctors and dentists to staff privileges.[5]
 
 
 7
 The claims of racial discrimination were, as the District Court found, "clearly established." In fact the hospitals' applications for federal grants for construction projects openly stated, as was permitted by statute, 42 U.S.C.A. § 291e(f), and regulation, 42 C.F.R, § 53.112, that "certain persons in the area will be denied admission to the proposed facilities as patients because of race, creed or color." These applications were approved by the North Carolina Medical Care Commission, a state agency, and the Surgeon General of the United States under his statutory authorization.
 
 
 8
 Both Cone and Long are nonprofit hospitals owned and governed by boards of trustees, and under state law they are duly constituted charitable corporations. The Long Hospital is governed by a self-perpetuating board of twelve trustees. The Cone Hospital, however, is governed by fifteen trustees, five of whom are selected by various state agencies, and one is appointed by a "public agency" as the District Court assumed for the purpose of its decision. Neither hospital's charter contains any explicit or implicit authorization or requirement for the exclusion of Negro professionals or patients.
 
 
 9
 By far the most significant governmental contact of these two hospitals is their participation in the federally assisted Hill-Burton hospital system. As a result of their involvement in the Hill-Burton hospital construction program both hospitals have received large amounts of public funds, paid by the United States to the State of North Carolina and in turn by North Carolina, through its Treasurer, to the hospitals. They received these funds as part of a "state plan" for hospital construction, which allocates available resources for hospitals within the state and contemplates and authorizes the defendants to exclude Negroes.
 
 
 10
 When this action was commenced, the United States had appropriated $1,269,950.00 to the Cone Hospital and $1,948,800.00 to the Long Hospital. Cone had already received these funds which amounted to about 15% of the total construction expenses involved in its two projects. Long had received most of the funds appropriated to it (over $1,500,000.00 already paid) which constitute about 50% of the total cost of its three projects.[6] These appropriations for the most part were after the Supreme Court's landmark decisions in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).
 
 
 11
 The Hill-Burton program requires that states wishing to participate must inventory existing facilities to determine hospital construction needs and to develop construction priorities under federal standards. State agencies are designated to perform this function and to adopt state-wide plans to be submitted for the approval of the Surgeon General of the United States. The designated North Carolina agency is the North Carolina Medical Care Commission. The Act provides for grants of federal funds for construction of new or additional facilities for governmentally owned hospitals and voluntary nonprofit hospitals.[7]
 
 
 12
 The allocation of federal funds among the states is determined by a mathematical formula based on population and per capita income. 42 U.S.C.A. § 291g. The "federal share" of costs of particular projects within a state is governed by federally approved state plans. 42 U.S. C.A. § 291e(f). North Carolina's current plan programs general hospital facilities based on a "federal share" of 55%. Through January 31, 1963, a total of 350 Hill-Burton projects was approved by the State of North Carolina. This involved 10,210 inpatient beds and 106 health units. The total cost of these projects was approximately $180,866,000.00 and the "federal share" amounted to approximately $77,854,000.00. Of these projects 325 were already in operation. They included 8496 inpatient beds and 100 health units. The total cost of these facilities was $139,650,000.00 and the "federal share" was $58,621,000.00.[8]
 
 
 13
 Participation in the Hill-Burton program subjects hospitals to an elaborate and intricate pattern of governmental regulations, both state and federal, of which the following categories are most significant for present purposes:
 
 
 14
 (1) The Act provides that if within 20 years after completion of a project a hospital is sold to anyone who is not qualified to file an application thereunder or is not approved by the state agency, or if the hospital ceases to be "nonprofit," the United States can recover a proportionate share of its grant to the hospital. 42 U.S.C.A. § 291h(e). The state agency is required to give notice of any such changes of status. 42 C.F.R. § 53.130.
 
 
 15
 (2) On its face the Act indicates that participating institutions, correlative to their right to receive monetary assistance, are obligated to render hospital services pursuant to specified "minimum standards (to be fixed in the discretion of the State) for the maintenance and operation of hospitals which receive Federal aid * * *." 42 U.S.C.A. § 291f(a) (7). And no federal grants are to be allocated to any state which does not enact legislation requiring compliance with the minimum standards. 42 U.S. C.A. § 291f(d). Within a year after the passage of the Hill-Burton Act, North Carolina, to meet its requirements, enacted a "Hospital Licensing Act" in 1947, N.C.Gen.Stat. § 131-126.1 et seq. (1958), authorizing the adoption of detailed regulations governing hospital maintenance and operation. The federal authorities prescribed and North Carolina adopted "Rules and Regulations for Hospital Licensure." These provide in detail for the management of hospitals under general headings such as administration, clinical services, auxiliary services, nursing service, and food service.
 
 
 16
 (3) The Act provides for federal decision as to the number of general hospital beds and other facilities required to provide "adequate service" in a state, for general methods of distribution in areas of a state, and for the general manner in which a state agency shall determine priorities of projects based on relative need. 42 U.S.C.A. § 291e(a), (b), (c), (d). State allowances in terms of number of beds per thousand population have been fixed by regulation, 42 C.F.R. § 53.11, as have the methods to be used by state agencies in distributing hospitals in a state. 42 C.F.R. §§ 53.12, 53.13. In addition the "separate-but-equal" provisions stipulate that facilities for separate population groups shall not be programmed for construction "beyond the level of adequacy for such group." 42 C.F.R. § 53.112. And federal standards governing the state agencies' determination of the priority of projects are set out in 42 C.F.R. §§ 53.71 to 53.80. See also 42 C.F.R. § 53.127(b) and 42 C.F.R. § 53.127(d) (6).
 
 
 17
 (4) A state, to participate in the Hill-Burton program, is required to submit for approval by the Surgeon General a state plan setting forth a "hospital construction program" which, among other things, "meets the requirements as to lack of discrimination on account of race, creed, or color, and for furnishing needed hospital services to persons unable to pay therefor, required by regulations prescribed under section 291e(f). * * *" 42 U.S.C.A. § 291f(a) (4).
 
 
 18
 Both state plans, 42 U.S.C.A. § 291f(a) (4) (D); 42 C.F.R. § 53.111, and project applications, 42 U.S.C.A. § 291h(a); 42 C.F.R. § 53.127(d) (4), are subject to this general nondiscrimination requirement. However, the Act, 42 U.S.C.A. § 291e(f), authorizes the Surgeon General to make a regulation to provide an exception to the general racial nondiscrimination rule by making "equitable provision" for separate hospitals for separate population groups. Thus, by statute and regulation the states may meet the nondiscrimination requirement "in any area where separate hospital, diagnostic or treatment center, rehabilitation or nursing home facilities and services of like quality for each such population group in the area, and * * * such finding is subsequently approved by the Surgeon General." 42 C.F.R. § 53.112.
 
 
 19
 Where a "separate-but-equal" plan is in operation, the individual applicant for aid need not give any assurance that it will not discriminate and, in fact, may expressly indicate on its application form, as did each of the defendant hospitals, that "certain persons in this area will be denied admission to the proposed facilities as patients because of race, creed, or color." The arrangement to extend aid is formally concluded by a memorandum of agreement signed by representatives of the applicant, the state agency and the Surgeon General.
 
 
 20
 Where a state seeks to meet the nondiscrimination requirement by programming separate facilities for different population groups, it is required to submit to the Surgeon General a "Non-Discrimination Report" (Form PHS-8). The preparation of this report requires the state agency specifically to enumerate the number of hospital beds available for each racial group. According to the record, the North Carolina Medical Care Commission submitted such a "Non-Discrimination Report" on January 3, 1962. It lists the L. Richardson Memorial Hospital as having 91 acceptable beds for "non-white" patients and none for "white"; Wesley Long Community Hospital as having none for "non-white" patients and 220 for "white"; and Moses H. Cone Hospital as having none for "non-white" and 482 for "white" patients.
 
 
 21
 Significant duties are imposed on the Surgeon General with respect to the "Non-Discrimination Report." 42 C.F.R. § 53.112 provides that a state agency's findings must be approved by the Surgeon General. Consequently, the Surgeon General has the duty of determining whether the state agency has properly applied the "separate-but-equal" formula, i. e., whether the state's plan actually makes "equitable provision" for all population groups. The "Non-Discrimination Report" submitted by the North Carolina Medical Care Commission on January 3, 1962, was approved by the Surgeon General on January 22, 1962.
 
 
 22
 The point of present interest is not the equality or lack of equality in "separate-but-equal," but the degree of participation by the national and state governments in the geographical proration of hospital facilities throughout the state.[9]
 
 THE LEGAL ISSUE
 
 23
 Upon this factual foundation the District Court formulated the question for determination as follows: "[W]hether the defendants have been shown to be so impressed with a public interest as to render them instrumentalities of government, and thus within the reach of the Fifth and Fourteenth Amendments to the Constitution of the United States." After first examining separately each of the above and other points of governmental contact, the court concluded that none was sufficient to impress the hospitals with the necessary "public interest." Then, considering the various factors together, the court agreed with the defendants that "zero [the quantum of each separate factor] multiplied by any number would still equal zero." Having found no "state action" the court declined to pass upon the constitutionality of 42 U.S.C.A. § 291e(f) and 42 C.F.R. § 53.112 since such a declaratory ruling was no longer necessary to the decision of the case and would therefore constitute a forbidden "advisory opinion."
 
 
 24
 Although the District Judge earnestly faced and sought to make a reasoned analysis of the problems presented, it is our conclusion that the case was wrongly decided. In the first place we would formulate the initial question differently to avoid the erroneous view that for an otherwise private body to be subject to the antidiscrimination requirements of the Fifth and the Fourteenth Amendments it must actually be "render[ed an] instrumentalit[y] of government * * *." In our view the initial question is, rather, whether the state or the federal government, or both, have become so involved in the conduct of these otherwise private bodies that their activities are also the activities of these governments and performed under their aegis without the private body necessarily becoming either their instrumentality or their agent in a strict sense. As the Supreme Court recently said in Burton v. Wilmington Parking Authority, 365 U.S. 715, 721-722, 81 S.Ct. 856, 859-860, 6 L.Ed.2d 45 (1961), a case involving racial discrimination by a privately owned restaurant operating on government property:
 
 
 25
 "The Civil Rights Cases, 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835] (1883), `embedded in our constitutional law' the principle `that the action inhibited by the first section [Equal Protection Clause] of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.' Chief Justice Vinson in Shelley v. Kraemer, 334 U.S. 1, 13 [68 S.Ct. 836, 842, 92 L.Ed. 1161] (1948). It was language in the opinion in the Civil Rights Cases, supra, that phrased the broad test of state responsibility under the Fourteenth Amendment, predicating its consequence upon `State action of every kind * * * which denies * * * the equal protection of the laws.' At p. 11 [of 109 U.S. at p. 21 of 3 S.Ct. 27 L.Ed. 835]. And only two Terms ago, some 75 years later, the same concept of state responsibility was interpreted as necessarily following upon `state participation through any arrangement, management, funds or property.' Cooper v. Aaron, 358 U.S. 1, 4 [78 S.Ct. 1401, 1402-1403, 3 L.Ed.2d 5] (1958). It is clear, as it always has been since the Civil Rights Cases, supra, that `Individual invasion of individual rights is not the subject-matter of the amendment,' [109 U.S.] at p. 11 [3 S.Ct. at p. 21, 27 L.Ed. 835], and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it. Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an `impossible task' which `This Court has never attempted.' [Citation omitted.] Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." (Emphasis added.)
 
 
 26
 Weighing the circumstances we are of the opinion that this case is controlled by Burton, where the Court held that the "activities, obligations and responsibilities of the [Parking] Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." 365 U.S. at 724, 81 S.Ct. at 864, 6 L.Ed. 2d 45.[10]
 
 
 27
 Here the most significant contacts compel the conclusion that the necessary "degree of state [in the broad sense, including federal] participation and involvement" is present as a result of the participation by the defendants in the Hill-Burton program. The massive use of public funds[11] and extensive state-federal sharing in the common plan are all relevant factors. We deal here with the appropriation of millions of dollars of public monies pursuant to comprehensive governmental plans.[12] But we emphasize that this is not merely a controversy over a sum of money. Viewed from the plaintiffs' standpoint it is an effort by a group of citizens to escape the consequences of discrimination in a concern touching health and life itself. As the case affects the defendants it raises the question of whether they may escape constitutional responsibilities for the equal treatment of citizens, arising from participation in a joint federal and state program allocating aid to hospital facilities throughout the state.
 
 
 28
 Not every subvention by the federal or state government automatically involves the beneficiary in "state action," and it is not necessary or appropriate in this case to undertake a precise delineation of the legal rule as it may operate in circumstances not now before the court. Prudence and established judicial practice counsel against such an attempt at needlessly broad adjudication. Our concern is with the Hill-Burton program, and examination of its functioning leads to the conclusion that we have state action here. Just as the Court in the Parking Authority case attached major significance to "the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service," 365 U.S. at 724, 81 S. Ct. at 864, 6 L.Ed.2d 45, we find it significant here that the defendant hospitals operate as integral parts of comprehensive joint or intermeshing state and federal plans or programs designed to effect a proper allocation of available medical and hospital resources for the best possible promotion and maintenance of public health.[13] Such involvement in discriminatory action "it was the design of the Fourteenth Amendment to condemn." 365 U.S. at 724,[14] 81 S.Ct. at 864, 6 L.Ed. 2d 45.
 
 
 29
 Two additional theories presented by the plaintiffs and the Government are worthy of note.
 
 
 30
 As the Government argued in its brief, the Hill-Burton Act itself and its legislative history reveal "emphasis on the creation of a State-wide system of hospitals for the provision of hospital service to all the people of the State [which] indicates that the Hill-Burton program was not limited to the granting of financial aid to individual hospitals. It shows, rather, a congressional design to induce the States, upon joining the program, to undertake the supervision of the construction and maintenance of adequate hospital facilities throughout their territory. Upon joining the program a participating State in effect assumes, as a State function, the obligation of planning for adequate hospital care. And it is, of course, clear that when a State function or responsibility is being exercised, it matters not for Fourteenth Amendment purposes that the * * * [institution actually chosen] would otherwise be private: the equal protection guarantee applies."[15]
 
 
 31
 Moreover, the Government's argument stresses the fact that the challenged discrimination has been affirmatively sanctioned by both the state and the federal government pursuant to federal law and regulation. 42 U.S.C.A. § 291e(f); 42 C.F.R. § 53.112. It is settled that governmental sanction need not reach the level of compulsion to clothe what is otherwise private discrimination with "state action."[16]
 
 
 32
 It remains to discuss the case of Eaton v. Board of Managers of James Walker Mem. Hospital, 261 F.2d 521 (4th Cir.), cert. denied, 359 U.S. 984, 79 S.Ct. 941, 3 L.Ed.2d 934 (1958). Not only the defendants but also the District Court relied on this as a precedent in apparent conflict with the present decision. This court held, upon consideration of certain sums paid by the City of Wilmington and the County of New Hanover, North Carolina, that the defendant hospital was not so impressed with "state action" as to require injunction under the Fourteenth Amendment against its racially discriminatory practices. Initially we note that Eaton was decided before the Supreme Court's decision in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In light of Burton doubt is cast upon Eaton's continued value as a precedent.[17] And we hold that the District Court erred in its attempt to distinguish the Burton decision. The Supreme Court's language and holding is not to be limited to cases involving lessees of public property. Also significant is the fact that the Eaton case did not involve any consideration of the Hill-Burton program, with its massive financial aid and comprehensive plans.[18] Moreover, no argument was presented in Eaton as to possible fulfillment by a private body of a "state" function pursuant to an extensive state plan.[19] And finally, the Eaton case did not consider what effect overt state and federal approval would have on otherwise purely private discrimination.
 
 
 33
 Having found the requisite "state action," necessarily we must remand to the District Court with directions to grant the requested injunctive relief.[20] We agree with the plaintiffs and the Government that adjudication of the statute's constitutionality is not advisory merely and that the plaintiffs have standing to challenge the constitutionality of 42 U.S. C.A. § 291e(f) and 42 C.F.R. § 53.112 which promote federally assisted and approved hospital facilities. To make any relief effective it becomes necessary to pass upon the validity of the statute and the regulation, because they contain an affirmative sanction of the unconstitutional practice.
 
 
 34
 These federal provisions undertaking to authorize segregation by state-connected institutions are unconstitutional.[21] The rest of section 291e(f), providing for hospital facilities without discrimination, however, remains in effect. The basic and overriding purpose of the Hill-Burton Act was to permit the states to develop programs of hospital construction that would provide adequate services "to all their people."[22] 42 U.S.C.A. § 291(a). It serves the dominant congressional purpose best to prune from the statutory provision only that language which adopted what is now known to be an unconstitutional means of accomplishing a constitutional end. The general prohibition against discrimination stands; only the exception tolerating "separate-but-equal" fails. Accordingly, we declare invalid only that portion of 42 U.S.C.A. § 291e(f) which reads:
 
 
 35
 "* * * but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group; * * *."
 
 
 36
 Unconstitutional as well under the Due Process Clause of the Fifth Amendment and the Equal Protection Clause of the Fourteenth are the relevant regulations implementing this passage in the statute.
 
 
 37
 This court does not overlook the hospitals' contention that they accepted government grants without warning that they would thereby subject themselves to restrictions on their racial policies. Indeed they are being required to do what the Government assured them they would not have to do. But in this regard the defendants, owners of publicly assisted facilities, can stand no better than the collective body of Southern voters who approved school bond issues before the Brown decision or the private enterpreneur who outfitted his restaurant business in the Wilmington Parking Garage before the Burton decision. The voters might not have approved some of the bond issues if they had known that the schools would be compelled to abandon their historic practice of separation of the races, and the restaurateur might have been unwilling to venture his capital in a business on the premises of the Wilmington Parking Authority if he had anticipated the imposition of a requirement for desegregated service. What was said by the Supreme Court in Burton in regard to the leases there in question is pertinent here:
 
 
 38
 "[W]hen a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself." (Emphasis added.) 365 U.S. at p. 726, 81 S.Ct. at p. 862, 6 L.Ed.2d 45.
 
 
 39
 We accord full weight to the argument of the defendants, but it cannot prevail. Not only does the Constitution stand in the way of the claimed immunity but there are powerful countervailing equities in favor of the plaintiffs. Racial discrimination by hospitals visits severe consequences upon Negro physicians and their patients.[23]
 
 
 40
 Giving recognition to its responsibilities for public health, the state elected not to build publicly owned hospitals, which concededly could not have avoided a legal requirement against discrimination. Instead it adopted and the defendants participated in a plan for meeting those responsibilities by permitting its share of Hill-Burton funds to go to existing private institutions. The appropriation of such funds to the Cone and Long Hospitals effectively limits Hill-Burton funds available in the future to create non-segregated facilities in the Greensboro area. In these circumstances, the plaintiffs can have no effective remedy unless the constitutional discrimination complained of is forbidden.[24]
 
 
 41
 The order of the District Court is reversed and the case is remanded for the entry of an order in conformity with the opinion of this court.
 
 
 42
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 42 U.S.C.A. § 291e(f) provides:
 "291e. General regulations Within six months after August 13, 1946 [the enactment of this title], the Surgeon General, with the approval of the Federal Hospital Council and the Secretary [of Health, Education, and Welfare], shall by general regulation prescribe —
 * * * * *
 "(f) That the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color, and shall provide for adequate hospital facilities for persons unable to pay therefor. Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group; and (2) there will be made available in each such hospital or addition to a hospital a reasonable volume of hospital services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial standpoint."
 
 
 [2]
 42 C.F.R. § 53.112 provides:
 "53.112 Nondiscrimination. Before a construction application is recommended by a State agency for approval, the State agency shall obtain assurance from the applicant that the facilities to be built with aid under the Act will be made available without discrimination on account of race, creed, or color, to all persons residing in the area to be served by that facility. However, in any area where separate hospital, diagnostic or treatment center, rehabilitation or nursing home facilities, are provided for separate population groups, the State agency may waive the requirement of assurance from the construction applicant if (a) it finds that the plan otherwise makes equitable provision on the basis of need for facilities and services of like quality for each such population group in the area, and (b) such finding is subsequently approved by the Surgeon General. Facilities provided under the Federal Act will be considered as making equitable provision for separate population groups when the facilities to be built for the group less well provided for heretofore are equal to the proportion of such group in the total population of the area, except that the State plan shall not program facilities for a separate population group for construction beyond the level of adequacy for such group."
 
 
 [3]
 Simkins v. Moses H. Cone Memorial Hospital, 211 F.Supp. 628 (M.D.N.C. 1962)
 
 
 [4]
 Id. 211 F.Supp. at 630-634
 
 
 [5]
 On the day following the order dismissing the case, Cone Hospital advised the plaintiffs, and publicly announced, that it would consider staff applications from Negroes. The policy with respect to Negro patients, however, was not changed
 
 
 [6]
 
 CONE HOSPITAL

 Project No. Federal Funds
 and Year Appropriated Total Cost Federal %
 Approved Purpose 5/8/62 of Project of Cost 

 NC-86 General Hospital $ 462,000.00 $5,277,023.32 -----
 (1954) construction

 NC-330 Diagnostic and 807,950.00 2,090,000.00 -----
 (1960) treatment center;
 general hospital
 construction
 _____ _____________ _____________
 Total $1,269,950.00 $7,367,023.32 17.2%*

 LONG HOSPITAL

 NC-311 New hospital $1,617,150.00 $3,314,749.40 -----
 (1959) construction

 NC-353 Laundry 66,000.00 120,000.00 -----
 (1961)

 NC-358 Hospital Nurses 265,000.00 492,636.00 -----
 (1961) Training School
 _____ _____________ _____________
 Total $1,948,800.00 $3,927,385.40 49.6%*
 
 
 *
 The court found "approximately" 15% for Cone and "approximately" 50% for Long
 
 
 [7]
 In the first fifteen years of the program (1947-1961) approximately $1.55 billion of federal funds were approved for such projects. Slightly more than half of the total went to voluntary nonprofit hospital projects. In the same period state and local funds (governmental and nongovernmental) totaled about $3.38 billion; thus, the federal share of Hill-Burton projects was slightly more than 30% of their total cost. See "Hill-Burton Program — Progress Report, July 1, 1947 — June 30, 1961," United States Department of Health, Education, and Welfare, Public Health Service Publication No. 880 (1961)
 
 
 [8]
 See "Hill-Burton Project Register: Hospital and Medical Facility Projects Approved During January, 1963," United States Department of Health, Education, and Welfare, Public Health Service-Division of Hospital and Medical Facilities (1963)
 
 
 [9]
 As an aside, it is to be noted that in "Equal Protection of the Laws in North Carolina," a Report of the North Carolina Advisory Committee to the United States Commission on Civil Rights (1962) (pamphlet), a special study group found that facilities available to non-whites were both inferior to those available to whites and more limited
 
 
 [10]
 Accord, Smith v. Holiday Inns of America, 220 F.Supp. 1 (M.D.Tenn.1963); see also Garner v. Louisiana, 368 U.S. 157, 183, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) (Mr. Justice Douglas concurring); Public Utilities Comm. v. Pollak, 343 U.S. 451, 462, 72 S.Ct, 813, 96 L.Ed. 1068 (1952)
 
 
 [11]
 In Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), the Court explained its decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), as follows:
 "That holding was that the Fourteenth Amendment forbids States to use their governmental powers to bar children on racial grounds from attending schools where there is state participation through any arrangement, management, funds or property." 358 U.S. at 4, 78 S.Ct. at 1402-1403, 3 L.Ed. 2d 5. (Emphasis added.)
 
 
 [12]
 Contrast the case at hand with Eaton v. Board of Managers of James Walker Mem. Hospital, 261 F.2d 521 (4th Cir.), cert. denied, 359 U.S. 984, 79 S.Ct. 941, 3 L.Ed.2d 934 (1958), where the local authorities by contract for care of indigents paid the hospital less than 4½% of its budget
 
 
 [13]
 See 42 U.S.C.A. § 291(a), (b), (c) ("Declaration of purpose with respect to construction of hospitals")
 
 
 [14]
 Accord, Peterson v. City of Greenville, 373 U.S. 244, 247, 83 S.Ct. 1119, 10 L.Ed. 2d 323 (1963)
 
 
 [15]
 Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); Guillory v. Administrators of Tulane Univ. of Louisiana, 212 F.Supp. 674 (E.D.La. 1962)
 
 
 [16]
 See McCabe v. Atchison, T. & S. F. R. Co., 235 U.S. 151, 161, 35 S.Ct. 69, 59 L.Ed. 169 (1914); cf. Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963); Williams v. Hot Shoppes, Inc., 293 F.2d 835, 846 (D.C. Cir. 1961) (Bazelon and Edgerton, JJ. dissenting)
 See also Gantt v. Clemson Agricultural College, 320 F.2d 611 (4th Cir. 1963), a school segregation case, where the court said: "The distinction drawn between prohibition and discouragement is a novel one in legal literature, and we must hold it unacceptable. Under the Constitution of the United States a state may no more pursue a policy of discouraging and impeding admission to its educational institutions on the ground of race than it may maintain a policy of strictly prohibiting admissions on account of race."
 
 
 [17]
 See Hampton v. City of Jacksonville, 304 F.2d 320, 323 (5th Cir. 1962) (Eaton questioned in the light of Burton). See also n. 12, supra. True, the opinion of the Fifth Circuit stresses the reverter feature in Eaton as the equivalent of the lease in the Burton case; but there is also in the present case, as we have seen, a reverter provision in the event of a sale of the hospital to an unqualified owner within 20 years after completion of a project. 42 U.S.C.A. § 291h(e); 42 C.F.R. § 53.130
 
 
 [18]
 It is now advanced as an argument against our conclusion that the Walker Hospital, like the hospitals here, received construction subsidies of federal origin at some stage of its history after the erection of the building at the expense of the initial private donor. The opinion of this court does not deal with this and indeed shows no awareness of it; nor was this argued to the court. Certainly the decision can scarcely be relied on as authority for a proposition not considered
 
 
 [19]
 See, e. g., Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 275 (1946); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944)
 
 
 [20]
 The District Court's opinion states that the defendants conceded that if the hospitals were found to embody the necessary "state action," "the plaintiffs were entitled to the injunctive relief sought."
 
 
 [21]
 See, e. g., Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954); cf. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 473 (1954); Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)
 
 
 [22]
 Senator Hill, co-author of the Hill-Burton Act, stated that it was intended to assist the states in preparing "a State-wide program for new construction so that all the people of the State may have adequate health and hospital facilities." Hearings before Senate Committee on Education and Labor on S. 191, 79th Cong., 1st Sess., p. 8
 
 
 [23]
 Cf. Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 114 (1950)
 Racial discrimination in medical facilities is at least partly responsible for the fact that in North Carolina the rate of Negro infant mortality is twice the rate for whites and maternal deaths are five times greater. See "Equal Protection of the Laws Concerning Medical Care in North Carolina," Appendix K (Subcommittee on Medical Care of the North Carolina Advisory Committee to the United States Commission on Civil Rights (mimeographed)).
 Exclusion of Negro physicians from practice in hospitals on account of their race denies them opportunities for professional improvement and has discouraged Negro physicians from practicing in the cities of the South. Reitzes, Negroes and Medicine, 272, 295, 316 (1958).
 
 
 [24]
 Raised in a preliminary motion in the District Court not pressed on appeal, was the question whether, since the complaint challenged the constitutionality of an act of Congress, a three-judge district court was required. See 28 U.S.C.A. § 2282. If there is state action, as we hold, the validity of the statute is no longer debatable, the recent decisions of the Supreme Court having clearly and uniformly decided against such distinctions as the statute permits. When the substantive issue has become so academic, the convening of a three-judge court is not required. See Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962)
 
 
 
 43
 HAYNSWORTH, Circuit Judge, with whom BOREMAN, Circuit Judge, joins (dissenting).
 
 
 44
 Believing the conclusion of the majority both unprecedented and unwarranted, I respectfully dissent.
 
 
 45
 If it is not made plain in the opinion of the majority, it should be clearly understood that neither of these hospitals came into existence under the promptings of federal or state officials, or because of the lure of large governmental subsidies.
 
 
 46
 Moses H. Cone Memorial Hospital was first organized in 1911. Mrs. Bertha Cone, the widow of Moses H. Cone, provided large sums of money for the purpose of establishing and constructing a nonprofit hospital in Greensboro, North Carolina. The corporation which she caused to be organized in 1911 has since successfully operated a large hospital in Greensboro providing a wide variety of medical services. It owned and operated facilities having a depreciated cost value of many millions of dollars, and, in addition, it had a substantial endowment. It was not until 1954 that the Cone Hospital, contemplating an addition to cost $5,277,023.32, made application for Hill-Burton funds in the amount of $462,000. In 1960, it filed a second application for Hill-Burton funds in the amount of $807,950 in connection with the construction of a diagnostic and treatment center and a further addition to its general facilities, costing in the aggregate $2,090,000. Both of these applications were approved, with the result that the Cone Hospital has received a total of $1,269,950 in Hill-Burton funds in connection with additions costing $7,367,023.32. As the majority opinion points out, the subsidies Cone received amounted to a little more than seventeen per cent of the cost of the 1954 and 1960 additions, but the subsidies amounted to a very much smaller proportion of the total cost of all of its facilities.
 
 
 47
 The facilities of the small 78-bed Wesley Long Hospital in Greensboro were antiquated. In 1959 and 1961, it filed three applications for Hill-Burton funds in aid of reconstruction and expansion projects designed to replace its antiquated facilities with modern ones and to enlarge its capacity to 150 beds. These applications were approved in the aggregate amount of $1,948,100, being approximately fifty per cent of the total cost of the construction programs undertaken in 1959 and 1961. The proportion of subsidy to the total value of all of its facilities does not appear.
 
 
 48
 It is against this background that we must approach the question of whether or not the present operation of these hospitals is "state action" in a constitutional sense, so that their operation is subject to the requirements of the Fourteenth Amendment.
 
 
 49
 The plaintiffs contend that state action should be found to have arisen out of the "totality" of the circumstances that a minority of the members of the Board of Trustees of the Cone Hospital are appointed by designated public officials, that Cone voluntarily cooperates with two state supported colleges in a program for the training of student nurses, and, with respect to both hospitals, that they are licensed by the state, as doctors, lawyers and restaurants are, that they enjoy a tax exemption, as every eleemosynary corporation in North Carolina does, and that they received Hill-Burton funds. Since the majority rests its opinion solely upon the receipt of Hill-Burton funds, we may dismiss the other suggested governmental contacts upon which the plaintiffs would rely, being unwilling to rely upon the Hill-Burton contention alone. The United States, as intervenor, readily concedes that the receipt of governmental subsidy alone would not make the subsequent operation of a hospital state action, but it finds in the Hill-Burton Act and the North Carolina statutes passed in compliance with it such regulation and power of control as to convert the operation of the hospitals into state action in a constitutional sense. This theory, adopted by the majority, distorts the Hill-Burton Act, its purposes and its operation in practice.
 
 
 50
 The Hill-Burton Act[1] was enacted in 1944 in recognition of the fact that throughout the country construction of hospital facilities had lagged behind the growing needs of our growing population. The country had only recently passed through the long, deep depression of the 1930's and was then still heavily engaged in the second world war. The avowed purposes of the Act were to assist the states in surveying the need for new hospital facilities and developing programs for the construction of needed facilities, and, secondly, to assist in the construction of "public and other nonprofit hospitals" in accordance with the state programs. Memory is not so dim, of course, that it cannot be recalled that, at the time, it was very politic to utilize state agencies wherever possible in the administration of federal programs of grants in aid and of assistance.
 
 
 51
 That the Congress intended the enactment of no regulatory scheme plainly appears from the provisions of the Act[2] that, "[e]xcept as otherwise specifically provided," nothing in the Act should be construed as giving any federal officer or employee any right of supervision or control over any hospital receiving grants in aid under the Act. The exception encompasses only the powers of the Surgeon General of the United States to approve or disapprove state plans and specific applications for grants in aid. It is thus clear that the Congress intended that receipt by a private, nonprofit hospital of a grant in aid should not result in a continuing right of control by the Surgeon General or by any other official of the United States. In short, subsequent operation of a hospital which had received a grant in aid of a construction program was not to be federal action.
 
 
 52
 This is substantiated by the legislative history. In the hearings before the Senate Committee on Education and Labor, Dr. Donald M. Smeltzer, President of the American Hospital Association, made it plain that, once a grant had been paid to a private hospital, the money would belong to the hospital; the grant was a gift.[3] Dr. Parran, Surgeon General of the United States, testified that the purpose was to assist the states "to fill out the missing pieces in the present hospital pattern, and that the hospitals continue to be under local government and voluntary management as they are now."[4]
 
 
 53
 The donee of such a gift does not become an arm of the donor.
 
 
 54
 In 1945, North Carolina adopted a statute,[5] as contemplated by the Hill-Burton Act, authorizing the North Carolina Medical Care Commission to survey and determine the need for hospital facilities and what, if any, state assistance was needed by public and private nonprofit hospitals in financing their construction programs. The statute, of course, authorizes the Commission to receive funds from the United States and such funds as might be appropriated by North Carolina, out of which it was authorized to make grants in aid to public and private nonprofit hospitals for construction projects. The statute goes no further than to authorize the Commission to perform those administrative functions in cooperation with the Surgeon General, as are contemplated by the Hill-Burton Act. There is nothing in it which suggests that the Commission was empowered to exercise regulatory or supervisory functions over the operation of private nonprofit hospitals, whether or not their operators had been the recipients of grants in aid of construction projects. The Attorney General of North Carolina, rendered an opinion on February 10, 1962, in which he stated that the Commission had no regulatory or supervisory powers in connection with the operations of these hospitals or of their administrative and professional staffs, and the Executive Secretary of the Commission filed an affidavit in which he disclaimed the existence of any such power. Indeed, the record is barren of any suggestion that the state statute contemplated exercise by the Commission of any such power or that the Commission ever undertook the exercise of any such power.[6]
 
 
 55
 The Hill-Burton Act and the North Carolina statute complementing it thus provided the machinery by which a hospital, owned and supported by a subdivision of North Carolina or by a private nonprofit corporation, might apply for a grant in aid of a contemplated construction program. Such an application would be granted only if, based upon the Commission's survey, it was found that there was a need for the contemplated facilities, and those of greater need were to be approved before those of lesser need. There is no suggestion whatever, however, that North Carolina undertook in any other way, as a function of the state, the provision of adequate hospital facilities throughout the state for the benefit of all of its people. The state does provide medical facilities of a specialized nature, as for the care of the insane, but the statutes do not empower the Medical Care Commission to provide general hospital facilities in a locality in default of cooperative efforts by local governmental bodies or citizens for the provision of such facilities. The role of the Commission is strictly limited, as is the role of the United States, to providing grants in aid of local effort, and the Commission is empowered to do nothing in the absence of such local effort. The assertion of the United States that North Carolina had undertaken a duty to provide local hospital services, where none were otherwise provided, is without any support whatever.
 
 
 56
 In this aspect of the case, the so-called "state plan" is no more than a survey of existing facilities to be utilized as a basis for judgment as to the relative need of such additional facilities as might be proposed by local governmental bodies or private nonprofit corporations or groups. In this scheme of things, these two hospitals played the same role in the same way before they applied for and received grants in aid of construction programs as they did afterwards. The facilities they operated before necessarily were taken into account and were highly relevant to any determination of the need of additional facilities in Greensboro. Afterwards, in exactly the same way, their expanded facilities entered into the survey and were highly relevant to a determination of any need for additional facilities in the area.[7] Whether the expansion and improvement of these hospitals were accomplished with or without grants in aid, they would have affected the "plan" in precisely the same way. If then, the operation of these hospitals was not state action before their receipt of the grants in aid, a determination that their operation is now state action depends wholly upon the fact that they received the grants in aid. The parties in the controversy are agreed that receipt of the grants, alone, does not permit a conclusion that subsequent operation of the hospitals is state action. Certainly no court has yet held that the private operation of any endeavor becomes state action merely because its construction or operation has been subsidized by Government. But that is all there is in this case.
 
 
 57
 Here it should be noted that as to North Carolina the first of the stated purposes of the Hill-Burton Act was largely accomplished in 1945, or soon thereafter, when North Carolina enacted a statute within the contemplation of the Act, created its Medical Care Commission, and that Commission made the survey and adopted regulations meeting Hill-Burton's requirements. Indeed, North Carolina had conducted its hospital survey before Hill-Burton's enactment in 1944. When the first of these grants in aid was approved in 1954, approximately nine years after the first of the stated purposes of Hill-Burton had been accomplished, it was clearly in furtherance of the second of its stated purposes, to assist in the construction of "public and other nonprofit hospitals." From this, one cannot reasonably infer that an "other" than public nonprofit hospital, the construction of which was thus assisted, became public because of the assistance.
 
 
 58
 The majority appears to make much of the fact that, as authorized by the statutes, the Surgeon General and the North Carolina Medical Care Commission require certain minimal construction standards as a condition of the approval of grants in aid, but it does not follow from such requirements that the United States or North Carolina has so reached into the operation of the hospitals as to make that function a governmental one. Inevitably, when Government subsidizes, it requires assurance that its subsidy will be used for the intended purpose. Applications for grants in aid for construction programs which are not needed are not to be approved, nor should they be approved if the proposed facilities will not serve the intended purpose. The minimal construction standards are provided only for the purpose of assuring that the facilities actually constructed with the help of a grant in aid will adequately serve the need which prompted the allowance of the grant. Anything short of that would be a profligate and irresponsible waste of public money; anything more than that cannot be spun out of this record.[8]
 
 
 59
 Finally, reference is made to the fact that there is a right to recapture a proportionate part of a grant in aid in the event that the constructed facilities are abandoned for hospital purposes or transferred to an unqualified operator within twenty years. That provision, however, creates no interest in the facilities. It is not comparable to a right of reverter retained by a public body. It simply creates a limited and declining personal right of action against the recipient of the grant in aid if it deserts the purpose it represented it had when it obtained the grant. Again, this is no more than a necessary provision for the protection of public moneys against unreasonable profligacy.
 
 
 60
 Any system of governmental subsidization necessarily carries with it the terms or conditions which must be met if the subsidy is to be obtained by a particular applicant. The tobacco farmer cannot obtain price supports if he does not comply with the quota requirements. A farmer cannot obtain a soil bank payment if he devotes his land to an unallowable use. A private, nonprofit college cannot obtain from the Small Business Administration a grant in aid of research unless it agrees to devote the money to a research project calculated to be of assistance to small businesses and which merits the approval of the Small Business Administration. The imposition of such conditions upon the receipt of subsidies is not, in a legal sense, the exercise of such control or the assumption of such authority as to make the subsequent operations of the recipient state action in a constitutional sense. The tobacco farmer harvesting his inquota tobacco or another farmer planting trees on his soil bank land is performing no function of state or nation, though his work, as all legitimate, productive work, contributes to the economic health of the nation.
 
 
 61
 Here, it is apparent that a private operator of a nonprofit hospital must meet the conditions upon which grants in aid are made available if it wants to obtain the grant, but, having done so, its subsequent operation is not made thereby a governmental function. We may extract from the statutes such words as "plans," "surveys" and "programs," but magnification of the extracted words cannot convert the conditions of the grant in aid program into an authoritative regulatory program which the Congress specifically proscribed and which the State of North Carolina disavows. The truth is plain. This scheme for grants in aid to hospitals differs neither in kind nor degree from any other provision for grants in aid of private endeavor.
 
 
 62
 The question should be regarded as foreclosed in this Circuit by our decision in Eaton v. Board of Managers of The James Walker Memorial Hospital, 4 Cir., 261 F.2d 521. There, it appeared the municipality conveyed the original site to the hospital, reserving to itself a right of reverter in the event the land ceased to be used for hospital purposes. Public officials selected the original board of trustees, but the original facilities were constructed with the private funds of Mr. Walker. That occurred shortly after the turn of the century. Much later, other land was acquired in fee and additional facilities were built. The complaint, as the records of this court disclose, alleged that the hospital "received large grants of money from the Federal Government" for its expansion project, an allegation which was admitted by the motion upon which the case was decided. In addition, it appeared that the city and county made annual payments to current operating revenues under contracts providing for the care of indigent patients. During the six years, 1952 through 1957, these annual contributions to operating revenues amounted to more than $277,000. These contributions to operating funds, as the majority points out, amounted, on the average, to approximately four per cent of the operating budget, but they were far from inconsequential, and the fact is that the hospital had also received construction subsidies of federal origin, just as had the hospitals here.
 
 
 63
 It is true that, in holding that the Walker Memorial Hospital "was not an instrumentality of the State but a corporation managed and operated by an independent board free from State control," our attention was concentrated upon the annual contributions to operating funds rather than upon the contributions to capital funds, but the case is quite indistinguishable in its facts. Indeed, the cases here are stronger for the defense, for these hospitals are not shown to have been the recipients of any contributions toward operating revenues, and the land of neither is subject to any right of reverter in favor of any governmental body.
 
 
 64
 I find no reason for thinking that our decision in Eaton was overruled or weakened, as applied to the facts here, by the decision of the United States Supreme Court in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. There, Wilmington Parking Authority, an agency of the State of Delaware, constructed a parking facility, of which a restaurant was an integral part. It leased the restaurant area to a restaurant operator. Under the lease, the Authority supplied to the restaurant heat and fuel, and the Authority maintained exterior surfaces and had the right to place directional signs upon them. Fixtures placed in the leased area by the lessee became the property of the Authority and were not subject to taxation. The entire building, however, and this is the point of Burton, was a public building owned by a public authority and serving a public purpose. It was conceived and constructed as an entity, the restaurant being a necessary or an appropriate adjunct to the other services offered in the building. That the Authority chose to operate the restaurant through a lessee did not destroy the public character of the restaurant which it inevitably acquired from the building. Concessionaires and lessees in governmental buildings such as capitols and courthouses take on the character of the buildings and of the primary functions they serve. They necessarily are understood to be serving a public purpose and discharging a public function.
 
 
 65
 Here, in contrast, these hospitals are not publicly owned. They serve no public purposes, except that their operation contributes to public health, just as it did before their receipt of Hill-Burton funds. The state has an interest in public health, but identity of interest does not convert a private organization into a public body. That a private organization's operations are compatible with governmental purposes is a cause of satisfaction, but, when a private organization operates on its own premises, in its own way, free of governmental supervision and control, its operations cannot be said to be state action.[9]
 
 
 66
 The suggestion of the majority that the Court of Appeals for the Fifth Circuit in Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320, questioned our decision in Eaton in the light of the Supreme Court's decision in Burton v. Wilmington Parking Authority is wholly unwarranted in this context. Chief Judge Tuttle, in his opinion, thought that, in the circumstances of the transfer of the golf course by the City, reservation of the right of reverter was comparable to a lease arrangement such as that involved in Burton v. Wilmington Parking Authority. Thinking so, he suggested that Eaton might have been otherwise decided had it come before us after Burton, but only because of the presence in Eaton of the right of reverter in favor of the municipality. There is present here no right of reverter in favor of any governmental authority, and the question posed by Chief Judge Tuttle in Hampton is wholly inapposite here. There is nothing in his opinion even obliquely critical of Eaton in the context with which we are now concerned.
 
 
 67
 Interestingly, Judge Jones concurred in Hampton upon a very limited ground having no bearing upon the authority of Eaton in any context, while Judge Gewin dissented. Judge Gewin found Eaton persuasive after Burton v. Wilmington Parking Authority even in the specific context of the reserved right of reverter in favor of the municipality.
 
 
 68
 The specific question with which we deal, the effect of the receipt of Hill-Burton funds upon the operation of an otherwise private, nonprofit hospital, has been considered by other courts. They have been unanimous in their conclusion that the operation of such hospitals is not state action so as to make applicable to them the provisions of the Fourteenth Amendment. The Supreme Court of Appeals of Virginia considered the question in Khoury v. Community Memorial Hospital, Incorporated, 203 Va. 236, 123 S.E. 2d 533. Judge Michie, of the Western District of Virginia, dealt with it in Wood v. Hogan, 215 F.Supp. 53. Finally, Eaton, who brought the earlier case against the Board of Managers of Walker Memorial Hospital before us, filed a new action against the Board of Managers of that hospital, seeking a readjudication based upon an attempt to more particularize the facts and upon a contention that the decision of the Supreme Court in Burton v. Wilmington Parking Authority changed the legal climate. Judge Butler held against the plaintiff and dismissed the complaint. Eaton v. Grubbs, E.D.N.C., 216 F.Supp. 465.[10]
 
 
 69
 Recent measures in the Congress may bear upon governmental understanding of what was undertaken by the Hill-Burton Act and the state statutes enacted in order to qualify hospitals within the states for the grants in aid. On August 7, 1963, the Senate rejected a proposal that henceforth grants in aid to hospitals under the Hill-Burton Act be restricted to hospitals which are desegregated and which practice no discrimination on account of race.[11] Other broader proposals for the elimination of racial discrimination in broad categories of institutions and businesses, to be applied prospectively, are now pending before the Congress. These proposals lend some emphasis to what is so clearly apparent from the original Hill-Burton Act that the Congress had no idea that grants in aid authorized through cooperative state agencies would convert the subsequent operation of recipient private hospitals into state action so as to bring them under the Fourteenth Amendment. The Congress may properly reconsider this matter, and, undoubtedly, it has the power, if it chooses to exercise it, to condition future grants of Hill-Burton funds to the execution of nondiscrimination agreements. Under these circumstances, it seems to me particularly inappropriate for us to now hold that the Congress, unbeknownst to itself, in 1944 had done what it now has under consideration for prospective operation only.
 
 
 70
 For the foregoing reasons, I would affirm the judgment.
 
 
 
 Notes:
 
 
 [1]
 42 U.S.C.A. § 291 et seq
 
 
 [2]
 42 U.S.C.A. § 291m
 
 
 [3]
 Hearings before the Senate Committee on Education and Labor on S. 191, 79th Cong., 1st Sess. p. 22
 
 
 [4]
 Ibid. p. 60
 
 
 [5]
 General Statutes of North Carolina § 131-120
 
 
 [6]
 Under a separate statute, no hospital may be operated in North Carolina without a license from the Commission. § 131-126 et seq. No such license may be obtained or renewed unless the hospital meets certain maintenance and operational standards as prescribed by the Commission. The licensure statute, however, applies to every hospital in North Carolina, whether or not it ever received Hill-Burton funds. It is altogether comparable to statutes which require licenses for the practice of medicine and of law and which prescribe minimal standards of training and of competence. It is comparable to restaurant licensing statutes which prescribe minimal sanitary standards. All of such statutes are designed to protect the public from gross professional incompetence or slovenliness
 It bears repeating, however, that the licensing statute applies to all hospitals, those which have received no Hill-Burton funds as well as to those which have.
 
 
 [7]
 I find no warrant for the majority's statement that "the defendant hospitals operate as integral parts of comprehensive joint or intermeshing state and federal plans or programs designed to effect a proper allocation of available medical and hospital resources for the best possible promotion and maintenance of public health." The fact that these hospitals exist and operate must be taken into account in determining what, if any, additional hospital facilities are needed in the Greensboro area. Their "operation" is no part, much less integral, of someone else's plan to assist in providing additional hospital facilities in the areas of greatest need. Neither those of us who are well fed nor those of us who are underfed may be said reasonably to "operate as integral parts" of a governmental plan to make surplus foods available to indigents. A determination of those of us who are indigent is an essential part of the plan, but those whose heads are counted are neither integrally nor otherwise a part of the plan, though those on one side of the dividing line are its beneficiaries
 
 
 [8]
 Minimal operational and maintenance standards are prescribed as a condition of licensing, but the licensing statutes apply to all hospitals without regard to the receipt of Hill-Burton funds. See fn. 6, supra
 
 
 [9]
 Of course, when public facilities are nominally transferred to private interests in order to escape constitutional commands and with the intention that the facilities will continue to be devoted to public use as in the past, they are not private. Hall v. St. Helena Parish School Board, E.D.La., (Three Judge Court) 197 F.Supp. 649; Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320; and see Griffin v. Board of Supervisors of Prince Edward County, 4 Cir., 322 F.2d 332; cf. City of Greensboro v. Simkins, 4 Cir., 246 F.2d 425
 
 
 [10]
 See also such cases as Norris v. Mayor and City Council of Baltimore, D.Md., 78 F.Supp. 451, and Mitchell v. Boys Club of Metropolitan Police, D.C., D.D.C., 157 F.Supp. 101
 
 
 [11]
 Vol. 10 Southern School News No. 3, p. 5