Alexander SLAVCOFF

v.

**HARRISBURG POLYCLINIC HOSPITAL.**

Civ. No. 73–61.

United States District Court,
M. D. Pennsylvania.

March 25, 1974.

James H. Stewart, Jr., Harrisburg, Pa., for plaintiff.

Edward E. Knauss, III, McNees, Wallace & Nurick, Harrisburg, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, District Judge.

In this Civil Rights Action brought under 28 U.S.C. § 1331 and/or 28 U.S.C. § 1343,[1] plaintiff Alexander Slavcoff, a physician at defendant Harrisburg Polyclinic Hospital, alleges that his surgical and cystoscopic privileges were curtailed and restricted by the hospital without the safeguards of certain procedural rights guaranteed by due process of law.

In order to establish the jurisdictional prerequisites, plaintiff alleges (1) that the defendant hospital is a nonprofit

---

1. Under 28 U.S.C. § 1331, the Federal Question Statute, violations of the Fifth and Fourteenth Amendments are involved. Similarly, under 28 U.S.C. § 1343, plaintiff alleges that defendant was acting under color of state law in depriving him of his procedural rights.

**1000**

corporation organized and existing under the laws of the Commonwealth of Pennsylvania; (2) that defendant received substantial sums of Hill-Burton (Hospital Survey and Construction Act, 42 U.S.C. § 291 et seq.) funds; (3) that a substantial portion of defendant's income is derived from the Medicare and Medicaid programs of the Social Security Act, 42 U.S.C. § 1395 et seq. and 42 U.S.C. § 1396 et seq.; (4) that defendant is tax exempt; and (5) that defendant is extensively regulated by the state, which, among other things, has promulgated "regulations requiring review of the professional standards of the staff including utilization and tissue review." Defendant has moved to dismiss.

From the answers to interrogatories and the stipulation, the following facts emerge: [2]

The general control of the property and affairs of the Harrisburg Polyclinic Hospital is vested in its board of directors, a self-perpetuating body, none of whose members represent governmental entities.

From December, 1950 to September, 1971, the hospital received a total of $3,287,024 in Hill-Burton funds toward total construction costs of $9,724,034.[3] A total of $14,322,854 was expended by defendant on construction and capital equipment during the past ten years.

In the past five years, the hospital has derived 24.05%, or $16,302,400, of its operating income from reimbursements under the Medicare Program; and 7.-26%, or $4,923,202, of its operating income from reimbursements under the Medicaid Program. During that period, the hospital also received a total of $756,768 from the Pennsylvania Bureau of Vocational Rehabilitation for the care and training of patients following acute hospitalization. Its operating budget for that period totals $68,189,364, and it is exempt from federal taxation.

Harrisburg Polyclinic has been approved by the Pennsylvania Department of Public Welfare and it is inspected by the Commonwealth of Pennsylvania.

Capital Blue Cross serves as the fiscal intermediary for Medicare (42 U.S.C. § 1395h) at Harrisburg Polyclinic. The fiscal intermediary performs an auditing function, and can refuse reimbursement to participating hospitals if it determines that treatments rendered were medically unnecessary. It also determines the cost of services to Medicare patients, direct and indirect, less any costs deemed unnecessary to the efficient delivery of needed health services. In the performance of this task, the fiscal intermediary samples a percentage of discharges in order to ascertain whether the hospital facilities are being effectively utilized. It also reviews the quality of professional standards at the hospital to determine the necessity of medical treatment, rather than merely ac-

2. At oral argument held before this Court on December 7, 1973, counsel for both parties were cautioned about the necessity for developing a full evidentiary record in compliance with Braden v. University of Pittsburgh, 477 F.2d 1 (3rd Cir. 1973). Both sides agreed to rest upon the answers previously made by defendant to plaintiff's interrogatories as amplified by a stipulation detailing the factual significance of several statutes and regulations.

3.

| PROJECT | DATE | HILL–BURTON FUNDS | TOTAL CONSTRUCTION COST |
|---|---|---|---|
| North & South Wings | 12/50 to 11/54 | $1,217,234 | $2,276,252 |
| Southeast Extension | 7/59 to 12/59 | 179,774 | 780,185 |
| X-ray and Cobalt Therapy | 1/61 to 12/61 | 19,224 | 490,544 |
| Memorial Building | 12/63 to 10/66 | 947,792 | 2,627,043 |
| Clinic Building | 2/69 to 9/71 | 923,000 | 3,550,010 |
| TOTAL | | $3,287,024 | $9,724,034 |

cepting the decisions of the hospital, attending physician, or the reviewing committees, as to the advisability of the care provided. Such review, however, is solely for fiscal purposes, since the fiscal intermediary does not exercise any supervision or control over the practice of medicine, over the manner in which medical services are provided, over the selection, tenure or compensation of hospital employees, or over the administration or operation of the hospital.

As part of its function, the fiscal intermediary also determines whether the hospital has tissue, utilization, credentials, and transfusion committees, but does not set the standards to be employed by them. Those committees exercise control over the professional standards at the hospital by preventing continued removal of healthy tissue, by restraining misuse of the hospital facilities without medical necessity, and by reviewing the qualifications and practices of the members of the staff.

Harrisburg Polyclinic is also accredited (42 U.S.C. § 1395bb) by the Joint Commission on Hospital Accreditation and was so accredited prior to the Medicare Act. As spelled out in § 1395bb, the effect of accreditation is to automatically bring the institution within the statutory definition of "hospital", as provided in 42 U.S.C. § 1395x(e). At oral argument counsel for plaintiff explained, without objection by counsel for defendant, that the Joint Commission on Accreditation is a completely private agency which has been recognized by the government as qualified.

At the outset, plaintiff would have this Court adopt a *per se* rule which could inject state or governmental action into any activity which benefits by the receipt of Hill-Burton Funds. To so truncate the jurisdictional inquiry at that point would, I believe, abrogate the

method of analysis spelled out in Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed. 2d 45 (1961): "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." The end product of the fact finding process must result in more than the mere conclusion that the state is involved in some activity of the institution. The state must be intertwined in the very activity which caused plaintiff's injury. Jackson v. Metropolitan Edison Co., 348 F.Supp. 954 (M.D.Pa. 1972). This was implicitly recognized by the Third Circuit Court of Appeals in affirming Jackson, supra, when the Third Circuit, after quoting from Moose Lodge 107 v. Irvis, 407 U.S. 163, 92 S. Ct. 1965, 32 L.Ed.2d 627 (1972), stated: "The Court thus recognizes the importance of a connection between the state regulation and the proscribed conduct." [4] The doctrine to which I thus adhere is that "the state action, not the private action, must be the subject of complaint." Powe v. Miles, 407 F.2d 73 (2nd Cir. 1968).[5]

The avowed purpose of the Hill-Burton Program (Hospital Survey and Construction Act, 42 U.S.C. § 291 et seq.) is:

"(a) to assist the several States in the carrying out of their programs for the construction and modernization of such public or other nonprofit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic, or similar services to all their people;

"(b) to stimulate the development of new or improved types of physical facilities for medical, diagnostic, preventive, treatment, or rehabilitative services; and

4. 483 F.2d 754, 756 (1973), cert. granted, 415 U.S. 912, 94 S.Ct. 1407, 39 L.Ed.2d 466 (1974).

5. See also, Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7th Cir. 1973); Lucas v.

Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972); Martin v. Pacific Northwest Bell Telephone Co., 441 F.2d 1116 (9th Cir. 1971); Kadlec v. Illinois Bell Telephone Co., 407 F.2d 624 (7th Cir. 1969).

"(c) to promote research, experiments, and demonstrations relating to the effective development and utilization of hospital, clinic, or similar services, facilities, and resources, and to promote the coordination of such research, experiments, and demonstrations and the useful application of their results."

As further amplified in the leading case of Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959, 963 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964):

"The Hill-Burton program requires that states wishing to participate must inventory existing facilities to determine hospital construction needs and to develop construction priorities under federal standards. State agencies are designated to perform this function and to adopt state-wide plans to be submitted for the approval of the Surgeon General of the United States . . . The Act provides for grants of federal funds for construction of new or additional facilities for governmentally-owned hospitals and voluntary nonprofit hospitals."

In spite of that, plaintiff cites Simkins, supra, and its progency, see, e. g., Sams v. Ohio Valley General Hospital Association, 413 F.2d 826 (4th Cir. 1969); Meredith v. Allen County War Memorial Hospital Commission, 397 F.2d 33 (6th Cir. 1968); Citta v. Delaware Valley Hospital, 313 F.Supp. 301 (E.D. Pa.1970), for the proposition that the necessary degree of state participation and involvement is supplied merely by the grant and acceptance of Hill-Burton Funds. Those cases are clearly distinguishable from the one at bar. Simkins itself dealt with the exclusion of certain races, creeds and colors from its facilities.[6] Translated into the analytical framework of this case, the rationale underlying Simkins is this: If the government doles out funds for the construction of hospital facilities, then those facilities must be open to all, regardless of race, creed or color. Since the sole purpose of the Hill-Burton Program is to deliver adequate medical treatment to the citizens of each state through a statewide plan of hospital construction, Mulvihill v. Julia L. Butterfield Memorial Hospital, 329 F.Supp. 1020 (S.D.N.Y.1971), the mere receipt of such funds hardly injects the state or federal government into the everyday operating affairs of this hospital.[7] This was recognized in Ward v. St. Anthony Hospital, 476 F.2d 671, 675 (10th Cir. 1973):

"There may be a point in the amount of governmental aid given private hospitals which renders the acts of its board members the acts of the state. We do not attempt to decide that question here. But in any event, we do not feel in the present case the Hospital has received governmental funding sufficient to invoke § 1983 jurisdiction . . . The percentage of Hill-Burton funds to total construction cost was approximately five percent. Such a small percentage of the total costs is not sufficient to invoke federal jurisdiction . . . ."

Issues identical to those at bar were recently litigated before and disposed of by Judge Muir of this Court in Ozlu v. Lock Haven Hospital, 369 F.Supp. 285,

---

6. In its application for Hill-Burton funds, the defendant hospital in Simkins, supra, "openly stated, as was permitted by statute, 42 U.S.C.A. § 291e(f), and regulation, 42 C. F.R. § 53.112, that 'certain persons in the area will be denied admission to the proposed facilities as patients because of race, creed or color.' These applications were approved by the North Carolina Medical Care Commission, a state agency, and the Surgeon General of the United States under his statutory authorization." Simkins, at 962.

7. 42 U.S.C. § 291m provides:
    "Except as otherwise specifically provided, nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any facility with respect to which any funds have been or may be expended under this subchapter."
    See also Pa.Stat.Ann. tit. 62, § 201 (1968) and discussion infra.

M.D.Pa., filed January 21, 1974, and I am in complete accord with the views expressed therein. Plaintiff, however, interprets [8] *Ozlu* as resting upon a finding that the total amount of Hill-Burton funds received from 1960 to 1963 represented only 4.2% of Lock Haven Hospital's gross receipts from 1959 to 1970. Contrariwise, Judge Muir made it clear that Lock Haven Hospital's Hill-Burton application was approved for $886,627.-55, a figure representing approximately one-third of the eligible project cost of $2,632,400. A similar proportion exists in this case, but over a more extended period. From December, 1950, to September, 1971, Harrisburg Polyclinic received a total of $3,287,024 in Hill-Burton funds toward total construction costs of $9,724,034.[9] In spite of the fact that the Court in Ward v. St. Anthony Hospital, supra, intimated that the receipt of governmental aid in an amount greater than five percent of construction costs may breathe state life into an otherwise private institution, I do not believe that the answer to this problem lies in the simple addition and division of numbers. The mere receipt of such funds does not render the state a partner in every function undertaken by the hospital. There must be a critical analysis of the purpose for which the funds are appropriated, and the relation of that purpose to the activity challenged. The Hill-Burton program was not designed to govern the day-to-day mechanics of hospital administration; it was created to provide adequate medical services to the public at large.

> "Participation in the Hill-Burton program subjects the hospital to an elaborate pattern of state and federal

regulation. The hospital is required to meet minimum standards of operation and maintenance, which are enforced by the state. The Act provides for federal decision as to the number of hospital beds and other facilities required to provide adequate services in a state . . .

> "There can be little doubt that the State of New York plays a substantial role in supervising the operations of private hospitals within its borders. However, this fact does not get us very far. The state, as part of its general regulatory scheme, does not in any way associate itself with or influence the internal decisions of a hospital's board of trustees to hire and fire staff members. The mere fact that New York regulates the facilities and standards of care of private hospitals or offers them financial support does not make the acts of these hospitals in discharging physicians the acts of the state." Mulvihill, supra at 1023.

For similar reasons, the hospital's receipt of a substantial portion of its operating income from the Medicare and Medicaid programs does not convert the activity challenged here into governmental action. See, e. g., Ward v. St. Anthony Hospital, supra, at 677–678. The parties have stipulated that the fiscal intermediary does not exercise any control or supervision over the administration or operation of Harrisburg Polyclinic.[10] The function of the fiscal intermediary, as set forth in the parties' stipulation, is to determine whether the charges assessed for the rendition of treatment to Medicare patients is justified. While the fiscal intermediary also ascertains whether the hospital has cer-

---

8. Plaintiff's views are expressed in a letter dated Feb. 13, 1974, which he submitted to this Court at the same time that he filed a stipulated statement of facts.

9. See footnote 3, supra.

10. 42 U.S.C. § 1395 provides:
   "Prohibition against any Federal interference
   Nothing in this subchapter shall be construed to authorize any Federal officer or

employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

tain committees to oversee the quality of professional standards and the effectiveness of facility utilization, it does not determine what criteria will be employed by those committees. As I interpret it, the purpose of the fiscal intermediary is to guarantee that Medicare funds are expended wisely and efficiently. The only conditions attached are that participating hospitals take steps to avoid unnecessary treatment. What those measures are, and how they are to be implemented, are left within the realm of private decision-making. Without some direct nexus between the hospital's source of part of its income and the harm allegedly suffered by plaintiff, state action would be found in countless enterprises. This was driven home by the Court in *Grossner v. Trustees of Columbia University in City of New York,* 287 F. Supp. 535, 547–548 (S.D.N.Y.1968):

> "A more fundamental point against plaintiff is that receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise, all kinds of contractors and enterprises, increasingly

dependent upon government business for much larger proportions of income than those here in question, would find themselves charged with 'state action' in the performance of all kinds of functions we still consider and treat as essentially 'private' for all presently relevant purposes . . ."

■ The same rationale holds true for the fact that Harrisburg Polyclinic is accredited by the Joint Commission on Accreditation of Hospitals. As recognized by the parties, the Joint Commission is a completely private entity. The effect of accreditation, 42 U.S.C. § 1395bb, is to bring a participating institution within the statutory definition of a "hospital", 42 U.S.C. § 1395x(e).[11] But even as so defined, Harrisburg Polyclinic still remains a private enterprise.[12]

Plaintiff also points to certain regulations promulgated by the Pennsylvania Department of Public Welfare.[13] From a facial reading of those regulations, it is clear that the state has not assumed control over the internal affairs of Harrisburg Polyclinic.[14]

11. Section 1395x(e)(3) of Title 42 U.S.C. provides that a statutorily defined hospital must have "bylaws in effect with respect to its staff of physicians." At oral argument, counsel for plaintiff stated that a participating hospital must provide for the creation of certain committees in its bylaws. The committees referred to were the Tissue, Utilization Review and the Credential Committees. See Appendix D of plaintiff's supplemental memorandum in opposition to motion to dismiss. The parties have agreed that the committees are not policed by the fiscal intermediary, and that they set their own standards of review. In addition, the purpose and functions of the utilization review committee are detailed in 42 U.S.C. § 1395x(k).

12. The fact that Harrisburg Polyclinic is exempt from federal taxation adds little to the analysis. Ward v. St. Anthony Hospital, supra; Brown v. Mitchell, 409 F.2d 593 (10th Cir. 1969).

13. See Appendix A of plaintiff's supplemental memorandum in opposition to dismiss. See also Pa.Stat.Ann. tit. 62, § 201 (1968).

14. "2160 MEDICAL STAFF
"2161 RESPONSIBILITIES
The governing body (licensee of a proprietary hospital) of the hospital shall delegate the responsibility of medical functions to the medical staff and the medical staff is responsible for the quality of medical care rendered to patients in the hospital. The standards of medical care will depend upon the character of the staff and the effectiveness of its organization to carry out its duties.
"2162 MEMBERSHIP
The active medical staff shall make recommendations to the governing board, (licensee in the case of a proprietary hospital), as to the professional qualifications of all who seek appointment on the staff.
The apointments shall be made by the governing body (licensee in the case of a proprietary hospital). They shall be appointed annually for a term of one year, and shall be so notified in writing.
The members of the medical staff shall be medical or osteopathic physicians who

Having considered the facts and all of plaintiff's contentions, I am convinced that the government has not so far "insinuated itself into a position of interdependence with (Harrisburg Polyclinic Hospital) that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, supra, at 725.

Accordingly, for the reasons expressed above, defendant's motion to dismiss will be granted and the complaint will be dismissed for lack of jurisdiction over the subject matter.

are licensed to practice in Pennsylvania. They shall be legally, professionally and ethically qualified for the positions to which they are appointed."