**Edward HOBERMAN, Plaintiff,**

v.

**LOCK HAVEN HOSPITAL,**
**Defendant.**

**Civ. No. 73–333.**

United States District Court,
M. D. Pennsylvania.

June 17, 1974.

H. Clay McCormick, Williamsport, Pa., Howard D. Venzie, Jr., Philadelphia, Pa., for plaintiff.

J. Thomas Menaker, Harrisburg, Pa., Eric W. Springer, Pittsburgh, Pa., for defendant.

## OPINION

MUIR, District Judge.

This action, which alleges that Plaintiff, a physician, was denied his right to a hearing by Defendant Lock Haven Hospital on charges that he engaged in unethical conduct, was first filed in the form of a Petition for Declaratory Judgment in the state court. On June 26, 1973, Defendant removed the action to this Court. Plaintiff then filed a motion to remand, alleging that the principal grounds for relief arose under state, not federal law. The motion to remand was denied by this Court on the ground that Plaintiff had stated a cause of action under 42 U.S.C. § 1983 and that, therefore, federal jurisdiction was present. The Court assumed jurisdiction over the Plaintiff's state law claim under principles of pendent jurisdiction. Following denial of the Defendant's mo-

tion to dismiss, a trial was conducted before this Court without a jury. At trial, the complaint was dismissed as to Defendant David W. Thomas for failure to state a claim, leaving Lock Haven Hospital as the sole defendant.

## I. Findings of Fact.

Plaintiff Edward Hoberman is a licensed physician and surgeon with full medical and surgical privileges on the staff of the Defendant Lock Haven Hospital (hereinafter referred to as "Hospital"). Defendant Hospital is a nonprofit Pennsylvania corporation approved by the Commonwealth of Pennsylvania to operate a general hospital in Lock Haven, Clinton County, Pennsylvania.

On July 6, 1971, David W. Thomas, M. D., a member of the Hospital medical staff, presented to Robert Beckley, M. D., Chief of the Medical Staff, formal charges of unethical practices and misconduct against Dr. Hoberman. The charges included solicitation of patients for surgery, coercion and harassment of doctors who do not refer all of their cases to Dr. Hoberman, uncontrolled emotional outbursts throughout the Hospital, and the equivalent of a fee-splitting arrangement with other members of the hospital staff. On or about July 7, 1971, Dr. Beckley gave a copy of the Thomas letter to Plaintiff and advised Plaintiff that the matter would be discussed by the medical staff executive committee in about two weeks. Dr. Beckley informed Plaintiff that he could answer the charges in writing if he wished or he could attend the medical staff executive committee meeting and have legal counsel there to advise him but that counsel could not participate in the meeting. Within a week after receiving the Thomas letter accusing the Plaintiff, Dr. Beckley received another letter, this one from Dr. "Y" accusing a Dr. "X", a fourth doctor, of certain professional misconduct. Dr. "X" was likewise notified of his right to respond and to be present at the medical staff executive committee meeting, where those charges would be considered.

Dr. Beckley took precautions in an attempt to reduce the possibility that the charges against the doctors would be publicized. Despite these precautions, the approximately 28 members of the hospital medical staff were aware that Dr. Thomas had brought charges of unethical conduct against Dr. Hoberman, even though the exact substance of those charges may not have been known. In addition, many people in the community of Lock Haven outside of the Hospital were aware of the charges because Dr. Hoberman himself showed the Thomas letter to various friends, civic leaders, and service organization members in the community.

On July 28, 1971, the executive committee of the hospital medical staff met in closed session to investigate and discuss the two letters accusing Plaintiff and Dr. "X" of misconduct. He was given an opportunity to appear at the meeting and to answer the charges against him. Plaintiff was given no opportunity to confront and cross-examine witnesses giving evidence against him. Although he did appear, Plaintiff refused to comment upon, admit, or deny, the charges made by Dr. Thomas, despite requests from persons at the meeting that he do so.

After considering the charges against both Plaintiff and Dr. "X", and their failure to deny or refute those charges, the executive committee concluded that the doctors had been guilty of professional misconduct. The Committee decided that while it had no authority to take disciplinary action under the by-laws governing the medical staff, some warning should be issued. Therefore, a memorandum to the medical staff was drafted providing in part:

"The Executive Committee of the Medical Staff acting in response to charges by two of the members of the Staff, submits the following:

"(1) Investigation confirms that there have been breaches of conduct

which are incompatible with good medical care and acceptable professional behavior.

"(2) Hospital rules now prescribe no penalties therefor. Recommendations to the staff for additions to rules and regulations to correct this deficiency will be submitted separately."

The memorandum was signed by each member of the executive committee and was circulated to the members of the medical staff with a copy of the "Principles of Medical Ethics" attached thereto.

Dr. Thomas, who had brought the charges against the Plaintiff, presented evidence to the executive committee in the absence of the Plaintiff, sat as a member of the executive committee, and participated in both the discussions and the finding against Dr. Hoberman. Richard Clover, M.D., presented evidence against Dr. Hoberman to the executive committee in the absence of the Plaintiff and participated in the discussions and finding of the executive committee.

The by-laws of the hospital medical staff in effect at the time of the July 28, 1971 executive committee meeting did not provide any mechanism for punishment of staff members found to have engaged in professional misconduct. However, Article VII, § 2, sub-§ 2 of the by-laws provided that the executive committee of the staff, sitting as the credentials committee, had the duty to "[i]nvestigate any breach of ethics that may be reported" and "[r]eview all information available regarding the competence of staff members and as a result of such review, to make recommendations for the granting of privileges, reappointments, and the assignment of members to various divisions and departments . . . ." Where the cre-

dentials committee recommends reduction of privileges or does not recommend reappointment. Article III, § 5 of the by-laws, while not setting out any specific procedural requirements in connection therewith, prescribes that the physician concerned shall be notified and given an opportunity to appear before the joint conference committee which consists of the executive committee of the staff and the executive committee of the Board of Trustees of the Hospital.

Although the July 28, 1971 memorandum to the medical staff did not expressly mention the name of Dr. Hoberman, it was the understanding of the members of the medical staff that the findings were specifically directed to Dr. Hoberman. At no time has the Hospital taken away or in any way restricted any privileges that were enjoyed by the Plaintiff as a member of the medical staff. The Plaintiff is a surgeon who derives a major portion of his patients by referrals from other physicians, but the number of referrals from other physicians to the Plaintiff has not diminished as a result of the charges of misconduct or the July 28, 1971 memorandum.

Immediately following the issuance of the findings by the executive committee, Plaintiff consulted counsel who, with various representatives of the Hospital, engaged in extensive negotiations in an attempt to arrange a re-hearing of the charges against the Plaintiff. The Plaintiff also filed counter-charges against Dr. Thomas which in essence charged Dr. Thomas with unprofessional conduct in accusing the Plaintiff of breaches of ethics without a reasonable belief therefor. Finally, in a letter to Plaintiff's counsel dated January 25, 1973, the Hospital's proposals for a re-hearing procedure were delineated.[1]

---

1. The Hospital's proposal for a re-hearing procedure provided:
 "1. The hearing will be a fact-finding one relating to the charges brought by Dr. D. W. Thomas against Dr. Edward Hoberman and those brought by Dr. Hoberman against Dr. Thomas.
 "2. The hearing will take place as soon as practical at the Lock Haven Hospital,

Lock Haven, Pa., the date to be fixed by mutual agreement.
 "3. There shall be a hearing officer appointed by the Board of Trustees of the Lock Haven Hospital who will preside at the hearing and also,
 a. insure that all participants in the hearing have a reasonable opportunity to be heard,

The proposed hearing procedures were not acceptable to the Plaintiff and his counter-proposals were forwarded to the Hospital. Negotiations involving a hearing on the charges by and against Dr. Hoberman were finally terminated when the Hospital refused to accept certain of Plaintiff's proposals including (1) that the Hospital submit to binding arbitration, and (2) that the cost of a medical arbitrator and a transcript of the proceedings be apportioned among the parties, including the Hospital, by the medical arbitrator. At all times during these negotiations, the Hospital rejected the position of the Plaintiff that the prior finding of the medical staff executive committee be erased from the record. It was the Hospital's position that any action relating to the prior findings could be brought up and determined at the proposed new hearing.

The Defendant Lock Haven Hospital is chartered as a private non-profit corporation, and is subject to state regulation and inspection. The minimum standards with which the Hospital is required to comply under state law are the "Rules and Regulations for Hospitals" promulgated by the Pennsylvania Department of Welfare. The Rules and Regulations help to insure that patients

> b. maintain decorum,
>
> c. determine the order of procedure during the hearing, and
>
> d. make rulings on questions or objections and as to the admissibility of information.
>
> "4. There shall be a hearing committee appointed by the Board of Trustees composed of at least three members of the medical staff who have not actively formally participated in consideration of the matter, however, knowledge of the matters in controversy shall not preclude a member of the staff from serving on the hearing committee. At the option of the contending parties an independent medical arbitrator may be engaged at their expense to hear and determine the matter.
>
> "5. The contending parties may at their option, be represented by medical or legal counsel of their choice.
>
> "6. A record will be kept of the hearing by one of the following methods: a shorthand or stenographic reporter, a tape recorder, or summarized minutes of the hearing. The cost of the shorthand or stenographic reporter shall be borne by the parties.
>
> "7. The contending parties shall have the following rights:
>
> a. to call and examine witnesses.
>
> b. to introduce exhibits and documentary evidence.
>
> c. to cross-examine any witness on any matter relevant to the issues and to rebut any evidence.
>
> "8. The hearing will not be conducted according to the strict rules of law relating to the examination of witnesses or the presentation of evidence. Any relevant evidence shall be admissible if it is the sort of evidence which responsible persons are accustomed to reply (sic) on in the conduct of serious affairs.
>
> "9. The contending parties are entitled to submit memoranda of points and supporting authorities.
>
> "10. The hearing shall be closed.
>
> "11. The charges brought by Dr. Thomas will be heard first and thereafter the charges brought by Dr. Hoberman will be heard.
>
> "12. The hearing officer may adjourn the hearing and reconvene the same at the convenience of the participants without special notice. Upon conclusion of presentation of oral and documentary evidence the hearing shall be closed. The hearing committee or the independent medical arbitrator, as the case may be, shall thereupon, outside the presence of any other person except the hearing officer, conduct its deliberations and render a decision and an accompanying report. The hearing officer may participate in the private deliberation of the hearing committee, or he may discuss the case with the independent medical arbitrator, as the case may be, but he shall not be entitled to a vote.
>
> "13. The decision of the hearing committee or the independent medical arbitrator, shall be based on the evidence produced at the hearing.
>
> "14. Either party may appeal the decision of the hearing committee or the independent medical arbitrator to the Board of Trustees within ten days after receipt of said decision. The proceedings before the Board of Trustees shall be in the nature of an appellate review and shall be based on the record of the hearing. Each contending party shall have the right to present written and oral statements in support of his position or appeal."

will receive adequate medical care. Although they are not concerned with the internal decisions of hospitals, the Rules and Regulations do require that each hospital establish a medical staff responsible for the quality of medical care rendered to patients in the hospital and responsible for evaluating the clinical work of its members. There is no provision relating to the procedural requirements of actions affecting the members of the medical staff.

The Hospital is accredited by the Joint Commission on Hospital Accreditation, a completely private agency. The standards which the Hospital must meet in order to be accredited by the Joint Commission are more stringent than the Rules and Regulations required for licensing by the state. The Joint Commission requires the Hospital to have a medical staff, one duty of which is to take all reasonable steps to insure professionally ethical conduct on the part of all members of the medical staff and to initiate such prescribed corrective measures as are indicated. The Joint Commission also requires the medical staff to adopt by-laws which, *inter alia*,

> "[p]rovide an appeal mechanism relative to medical staff recommendations for denial of staff appointment and reappointments, as well as for denial, curtailment, suspension, or revocation of clinical privileges. This mechanism shall provide for review of decisions, including the right to be heard at each step of the process when requested by the practitioner. The final decision must be rendered by the governing body, within a fixed period of time."

Between 1960 and 1963, the Hospital received over $868,000 for construction of a new hospital under the Hill-Burton Act, 42 U.S.C. § 291 et seq. The Hill-Burton Act establishes a program for the disbursement of funds for the construction of and modernization of governmentally owned hospitals and voluntary non-profit hospitals. The programs in each state are administered by designated state agencies pursuant to state wide plans, approved by the surgeon general of the United States. The $868,000 received by Lock Haven Hospital represented less than one-third of the eligible project cost of $2,632,400.00. The only conditions placed upon receipt of the funds were that the Hospital remain a non-profit health related facility for 20 years following completion of the new hospital, and that the Hospital comply with the Rules and Regulations promulgated by the Pennsylvania Department of Public Welfare mentioned above. The Hospital is subjected to no other state involvement as a consequence of participation in the Hill-Burton program.

A substantial portion of the Hospital's income is derived from the Medicare and Medicaid programs of the Social Security Act, 42 U.S.C. § 1395 et seq. and 42 U.S.C. § 1396 et seq. The Hospital receives approximately 9% of its operating income from reimbursements under the Medicaid program and approximately 27% of its operating income from reimbursements under the Medicare program. Both the Medicare and Medicaid programs require that the Hospital be approved by the Pennsylvania Department of Public Welfare. In order to qualify for the Medicare program, the Hospital must meet other standards, none of which relate to procedural requirements of actions taken by the medical staff.

In its various applications for participation in the Hill-Burton, Medicare, and Medicaid programs, the Hospital always noted that it was accredited by the Joint Commission on Accreditation. This representation automatically qualified the Hospital for participation in these programs, since the standards of the Joint Commission equalled or excelled those required for participation under the programs.

The Hospital has also received other grants or purchases of services from governmental units. Each year since 1968 the Hospital has received a grant of $5,000.00 from Clinton County, Pennsylvania. In 1970, the Clinton County

Municipal Authority issued $2,855,000 in tax-free municipal bonds and received a grant of $789,000 in federal Hill-Harris Funds from the Commonwealth of Pennsylvania to finance the construction of a 160-bed "long-term care" unit adjacent to the Hospital. This "long-term care" unit was completed in 1971. Since that time the Hospital has leased from Clinton County a space of 40 beds, the physical therapy room, and the occupational therapy room in this facility. In return for the lease agreement, the Hospital pays an annual rental and provides for the remaining 120-bed facility operated by the County, heating and hot water plant operation, dietary services, morgue, central sterile supply, medical and surgical items, sterilization facilities, maintenance services, laundry and housekeeping services, pharmacy services, and physical and occupational therapy services. Because the leased facility was financed by grant of Hill-Harris funds from the Commonwealth of Pennsylvania and a tax-free municipal bond issue, the Hospital is required to pay less annual rental to the county than would be required had the unit been financed by use of commercial debt financing.

Lock Haven Hospital is exempt from the payment of any real estate or income taxes to either the Commonwealth of Pennsylvania or any governmental subdivision thereof. Contributions to the Hospital are deductible as charitable contributions for purposes of the federal income tax.

## II. Discussion and Conclusions of Law.

Plaintiff alleges that the summary actions of the medical staff executive committee on July 28, 1971 deprived him of his constitutional right to due process of law under the U.S. Constitution. Plaintiff also alleges that the executive committee's actions were violative of his right under Pennsylvania law as a staff physician to a fair and impartial hearing. These two theories of liability will be discussed separately.

### A. Constitutional Claim.

Plaintiff asserts his constitutional claim pursuant to 42 U.S.C. § 1983 which provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law suit in equity, or other proper proceeding for redress."

It is Plaintiff's position that the Hospital acted under color of state law in circulating the July 28, 1971 memorandum and that the memorandum deprived him of his interest in liberty and property. Therefore, Plaintiff contends that he was entitled to a due process hearing prior to the alleged deprivation, and that the opportunity provided to him by the executive committee on January 28, 1971 to rebut the charges of Dr. Thomas was a constitutionally insufficient hearing.

There is little doubt that the actions of the executive committee on July 28, 1971 deprived Plaintiff of an interest in liberty which is protected by the Fourteenth Amendment against state action without due process of law. Although Dr. Hoberman was not named in the memorandum as the staff member found to have engaged in conduct "incompatible with good medical care and acceptable professional behavior," because of the small size of the medical staff it was well known that the memorandum was directed towards him. The concept of "liberty" within the meaning of the Fourteenth Amendment includes charges against a person that might seriously damage his standing and association in his community. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing

to him, notice and an opportunity to be heard are essential."

Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). A finding that a physician acted unethically would naturally tend to injure that physician's good name and reputation, even if, as here, it could not be shown that the finding financially injured the physician. Nor can there be any doubt that the July 28, 1971 "hearing" provided to the Plaintiff failed to pass constitutional muster. The decision reached by the executive committee of the medical staff turned on questions of fact and therefore due process required that Plaintiff be given the opportunity to confront and cross-examine witnesses. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Plaintiff was not given this right. More importantly, Dr. Thomas, who had originally filed the charges, presented evidence to the committee in the absence of the Plaintiff and participated in the discussions and the finding of the executive committee against Dr. Hoberman. A fair hearing before a fair tribunal is a basic requirement of due process. It is well settled that a tribunal which combines the functions of prosecutor and judge into one body does not meet the due process requirement of basic fairness. See In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Wasson v. Trowbridge, 382 F. 2d 807 (2d Cir. 1967).

Although Plaintiff has demonstrated that he was deprived of his interest in liberty without a fair hearing prior to the deprivation, nevertheless his constitutional claim fails for two important reasons: (1) He was not entitled to a constitutional due process hearing because the action of the executive committee of the medical staff was not "state action" as required by 42 U.S.C. § 1983; and (2) he was subsequently offered but refused to accept a re-hearing of the charges which would have conformed with the due process requirements of the Constitution.

1. State Action.

In a recent opinion in another case, this Court found that Lock Haven Hospital's dismissal of an employee-physician did not constitute "state action." Ozlu v. Lock Haven Hospital, 369 F. Supp. 285 (M.D.Pa.1974). In that case, the Court considered evidence relating to the receipt of Hill-Burton funds, Medicare and Medicaid funds, and state regulation and inspection pursuant to the Rules and Regulations of the Pennsylvania Department of Public Welfare, but found that the Plaintiff failed to demonstrate any causal connection between the state conduct and his injury. Although the record in the case at bar indicates additional governmental involvement not called to the court's attention in the Ozlu case, the additional evidence does not compel a different conclusion. It should be noted that in a case involving Harrisburg Polyclinic Hospital, where the evidence of state involvement was very similar to that in the present case, Judge Nealon of this Court reaffirmed our position in Ozlu and concluded that the action of the Hospital in curtailing and restricting a physician's privileges was not state action. Slavcoff v. Harrisburg Polyclinic Hospital, 375 F.Supp. 999 (M.D.Pa., filed March 25, 1974). The Ozlu case and the Slavcoff case are based in part upon the decision in Ward v. St. Anthony Hospital, 476 F.2d 671 (10th Cir. 1973), which held that a finding of "State action" in cases involving the rights of staff physicians requires proof that the state "has an interest in supervising or influencing the purely internal affairs of private hospitals." 476 F.2d at 675. Plaintiff contends that the requirement of Ozlu, Slavcoff, and Ward that there be a causal relation between some positive state action and the injury to the Plaintiff is inconsistent with the "state action" standards of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1971), which is undoubtedly the controlling case on the issue of whether the state has sufficient connection with a

nominally private entity to enable a Plaintiff to maintain an action under § 1983. Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973). In *Burton*, the Supreme Court held that the action of a privately owned restaurant in refusing to serve a black man was "state action" since the restaurant was located in a portion of a publicly owned parking facility and the space occupied by the restaurant had been leased from an agency of the state. The Court based its conclusion on an analysis of the state involvement: The land and building in which the restaurant was located were publicly owned and were dedicated to public uses; the costs of acquisition, construction, and maintenance were defrayed by donations from the city, loans, and revenue bonds; the state agency was responsible for maintenance of the buildings and these costs were paid out of public funds; a variety of mutual benefits were conferred by having a public parking facility available for restaurant guests and vice-versa; and the state agency could have in its lease affirmatively required the restaurant to discharge the responsibilities imposed by the Fourteenth Amendment.

> "By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a *joint participant in the challenged activity* which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." (emphasis added).

365 U.S. at 725.

Plaintiff is correct in his assertion that the *Burton* Court reviewed all the indicia of state involvement in the private conduct and did not find any particular fact as controlling. But it must be remembered that the Court focused its inquiry on the question of whether the state could be considered a "participant in the challenged activity" which, in *Burton* was the discriminatory refusal of service. Pervading the opinion was the fact that the restaurant was located in a public building dedicated to public use. Thus, while the *Burton* court found that the restaurant's refusal to serve a black customer was state action, it is doubtful that the same facts would have supported a conclusion that the restaurant's dismissal of a waitress without notice and hearing was unconstitutional state action. See Powe v. Miles, 407 F.2d 73, 83 (2d Cir. 1968).

■ Plaintiff contends that, unlike the Plaintiff in *Ozlu*, he has demonstrated that the state is a participant in the particular challenged activities of the Hospital. He points to the Pennsylvania Department of Public Welfare's Rules and Regulations for Hospital's with which the Hospital must comply under state law and as a precondition to the receipt of funds under the various federal and state aid programs. Specifically, he notes that the Rules and Regulations require that the Hospital establish a medical staff which is "legally, professionally and ethically qualified for the positions to which they are appointed." This requirement which is minimally necessary to insure that citizens of the state receive safe and adequate medical care does not carry with it a requirement that the Hospital adopt specified procedural safeguards in dealing with members of the medical staff. Nor is it significant that the hospital is accredited by the Joint Commission on Accreditation of Hospitals, the standards of which require that actions against a medical staff member be taken only after a hearing. The Joint Commission is a purely private organization. The fact that Lock Haven Hospital was automatically eligible for participation in the various federal and state aid programs because of its accreditation by the Joint Commission does not change the fact that Joint Commission accreditation is

not a requirement for participation in these programs.

■ The Court has sifted the facts and weighed the circumstances surrounding the involvement of the state in the private conduct of the Hospital, Burton v. Wilmington Parking Authority, *supra,* at p. 722, and has concluded, (1) that the economic aid which the Hospital receives from the state and federal government is not so dominant as to afford the basis for a contention that the state is merely utilizing private trustees to administer state activity, Powe v. Miles, *supra,* at p. 81, and (2) that regulation of the Hospital pursuant to state law and as a condition for governmental aid does not involve a state interest in supervising or influencing those actions of the Hospital which caused the harm allegedly suffered by the Plaintiff. Ward v. St. Anthony Hospital, *supra,* at p. 675. In other words, the state has not so far "insinuated itself into a position of interdependence with [the Hospital] that it must be recognized as a joint participant in the challenged activity. . . ." Burton v. Wilmington Parking Authority, *supra,* at p. 725. Plaintiff has failed to sustain his burden of proving that the July 28, 1971 action of the medical staff executive committee was "state action" as required by 42 U.S.C. § 1983.

2. Hospital's Offer of Subsequent Due Process Hearing.

■ As noted in the Court's findings of fact, after extensive negotiations between the parties the Hospital offered a rehearing of the charges by Dr. Thomas against Dr. Hoberman. See footnote 1. Even if it were determined that Plaintiff was entitled to a due process hearing on the charges against him, in my view, the rehearing offered by the Hospital complied with constitutional requirements. The proposed rehearing included the following safeguards: An impartial hearing committee consisting of at least 3 members of the medical staff who had not actively participated in the

matters under consideration, or at the option of the parties, an independent medical arbitrator engaged at the parties' expense; the right to be represented by medical or legal counsel; the right to call and examine witnesses; the right to introduce exhibits and documentary evidence; the right to cross-examine witnesses; a decision by the hearing committee or independent medical arbitrator based upon the evidence produced at the hearing; and the right to appeal the decision of the hearing committee or the independent medical arbitrator to the Board of Trustees.

■ Plaintiff contends that the rehearing proposed by the Hospital did not comply with constitutional due process requirements in that the Hospital would not agree to be bound by the decision of an independent arbitrator and that the Hospital would not agree to remove the July 28, 1971 executive committee finding from the record. "Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). In my view, the Hospital had no duty to submit to binding arbitration. The proposed rehearing would have been before a hearing committee composed of at least three members of the medical staff who had not actively or formally participated in consideration of the charges against Dr. Hoberman, but who may have had knowledge of the matters in controversy. Due process, of course, requires an impartial decision maker. But prior involvement in some aspects of a case will not necessarily bar a person from acting as a decision maker in that case so long as he did not participate in the making of the determination under review. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The Hospital also agreed that the parties could at their option and own expense, engage an independent medical arbitrator to hear and determine the matter. The fact that the Hospital did not agree to be bound by

the hearing committee or the independent medical arbitrator makes little difference, since Plaintiff's interest in clearing his name would surely have been accomplished upon a favorable decision by whomever heard the case. Since no affirmative action in the way of curtailment of privileges was ever taken against Dr. Hoberman, there is no affirmative action which the Hospital would have been required to take. Nor is there merit to Plaintiff's proposition that the Hospital was required to remove the July 28, 1971 finding from the record. Although Plaintiff contends that this refusal of the Hospital tends to make the subsequent hearing more in the nature of an appeal, the procedures of the proposed rehearing indicate that it was to be a de novo hearing, not an appeal. Plaintiff also argues that the prior findings should be expunged from the record because he is entitled to a fair hearing *before* he is adjudged to be guilty of the charges against him. However, in a case involving the dismissal of a civil service employee for allegedly having made recklessly false and defamatory statements about fellow employees, the Supreme Court held: "Since the purpose of the hearing in such a case is to provide the person 'an opportunity to clear his name,' a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause" Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (filed April 16, 1974). As noted previously, Plaintiff suffered no curtailment of privileges as a result of the July 28, 1971 finding, and his interest in clearing his name could have been accomplished at the rehearing despite the Hospital's refusal to remove the prior finding from the record. Furthermore, the Hospital stated that the issue of what to do about the prior finding could be raised at the rehearing. This could only mean that had the rehearing resulted in a decision favorable to the Plaintiff, the Hospital would have taken appropriate action as to the prior finding.

I have concluded that the proposed rehearing offered by the Hospital in its letter of January 25, 1973 fully complied with due process requirements under all the circumstances. It should be noted that the only relief requested by Plaintiff in this action was that the Hospital be ordered to provide him a rehearing at this time. Had the Court been inclined to do so, the procedural safeguards of the ordered hearing would not have exceeded those previously offered by the Hospital.

### B. State Law Claims.

 Plaintiff contends that under principles of contract law and under state law requiring that non-profit organizations act fairly in dealing with its members, he is entitled to a fair hearing on the charges against him. In Berberian v. Lancaster Osteopathic Hospital Association, Inc., 395 Pa. 257, 149 A.2d 456 (1959), the Pennsylvania Supreme Court held that the relationship of a medical staff member to a hospital is essentially one of contract, and that the medical staff by-laws, approved by the hospital directors, became a part of that contract. Therefore, where the by-laws of the medical staff of the hospital require that a staff member be provided a hearing prior to dismissal from the medical staff, the hospital is bound by that provision and must provide the physician with a fair and impartial hearing. Had Dr. Hoberman been dismissed as a member of the medical staff or had any of his privileges as a medical staff member been curtailed, he would have been entitled to a hearing as a matter of contract because the medical staff by-laws provided for a hearing in such circumstances. But the Plaintiff was not subjected to any curtailment of privileges. Under the by-laws, the executive committee had the duty to investigate any breach of ethics that may be reported. That is exactly what they did, and other than the issuance of the findings of the executive committee, no other affirma-

tive action was taken against the Plaintiff. The Plaintiff was not deprived of any rights specifically conferred upon him by the medical staff by-laws. I do not read *Berberian* as authorizing a court to insure that as a matter of contract right, a staff member be treated fairly in all respects even though there is no provision in the by-laws covering the specific treatment involved. Other cases cited by Plaintiff requiring reasonableness and procedural fairness when action taken by an organization adversely affects the individual interests of a member are not on point because in those cases the actions involved concerned dismissal from the organization. In the case at bar, the Plaintiff was not dismissed from the medical staff and in fact, the evidence indicated that the July 28, 1971 findings of the executive committee had no adverse impact upon Plaintiff's position as a member of the medical staff.

Even if Pennsylvania law would require that Plaintiff be afforded a fair and impartial hearing on the charges against him, for the reasons stated previously, the Hospital's proposed rehearing fully complied with the notions of justice and fair play.

For the reasons stated in this opinion, the Court will order the Clerk to enter judgment in favor of Defendant Lock Haven Hospital, together with costs. I feel it is appropriate to add the following observations. Since the parties had not been able to agree upon procedures for a rehearing of the charges against the Plaintiff, he found it necessary to seek the aid of the Court in settling the details of such a hearing. By this Opinion, the Court has found that, as a matter of law, the Hospital was not required to do more than it has already done. However, the dissension and bad feelings which accompanied the charges against Dr. Hoberman and the subsequent findings of the executive committee still exist at the Hospital. Therefore, the Court recommends that the Hospital keep open its offer of a rehearing in line with the proposals in its letter of January 25, 1973. It is the Court's firm conviction that should the Plaintiff accept the offer of a rehearing as proposed, the matters in controversy here will finally and fairly be determined, and the interests of the parties and of the Hospital will be best served.